**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| NORFOLK SOUTHERN CORPORATION, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. |
| HARTFORD FIRE INSURANCE COMPANY, | ) ) ) ) ) |
| Defendant. | ) |

**PLAINTIFF NORFOLK SOUTHERN CORPORATION'S
COMPLAINT FOR BREACH OF CONTRACT AND BAD FAITH**

Plaintiff Norfolk Southern Corporation ("NSC") files this Complaint for Breach of Contract and Bad Faith, showing the Court as follows:

Plaintiff NSC files this Complaint for Breach of Contract and Bad Faith seeking an award of compensatory damages and statutory penalties and attorney's fees pursuant to O.C.G.A. § 33-4-6 as a result of Defendant Hartford Fire Insurance Company's ("Hartford") breach of contract and bad faith failure to pay amounts owed under the builder's risk policy issued by it to NSC after being presented with a demand for payment for a covered loss in accordance with O.C.G.A. § 33-4-6. In support of its wrongful denial of coverage, Hartford fails to interpret the policy in accordance with the rules of construction and, instead, relies on illogical

interpretations of the terms and conditions of the policy and ambiguous terms of the policy, which contradict its prior representations as to the breadth of coverage provided by the policy.

## I. Parties

1. Plaintiff Norfolk Southern Corporation is a company formed under the laws of the State of Virginia with its principal place of business located in State of Georgia.

2. Defendant Hartford Fire Insurance Company is a company organized and existing under the laws of the State of Connecticut with a principal place of business located in the State of Connecticut.

3. Hartford may be served through its registered agent, CT Corporation System, located at 289 S. Culver St., Lawrenceville, Georgia 30046-4805.

## II. Jurisdiction and Venue

4. Defendant Hartford is subject to personal jurisdiction and venue of this Court.

5. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 as diversity exists as between Plaintiff NSC and Defendant Hartford as they are citizens of different states.

6. The amount in controversy, exclusive of interest and costs, exceeds $75,000.

### III. Background Information

7. In 2019, NSC broke ground on the construction of its new corporate headquarters to be located at 650 W. Peachtree Street, N.W., Atlanta, Georgia 30318 (the "Project").

8. The Project consisted of the construction of two office towers—the North Tower and the South Tower.

9. Between September 2019 and October 2019, drilled piers were installed as part of the foundation for the Project.

10. The drilled piers were installed by, among other things, drilling to the depth prescribed by the geotechnical engineer of record and pouring concrete into the drilled location.

11. The drilled piers were installed to, among other things, provide a stable base upon which to construct the towers and to support expected dead and live loads placed upon the building elements of the Project during and after construction.

12. The South Tower consists of seventeen floors and four below grade parking levels.

13. Twenty drilled piers were installed as part of the construction of the South Tower.

**A. The Loss Event.**

14. In July 2020, the general contractor for the construction of the shell of the Project notified the design team of a discrepancy in the elevation along one of the slab edges of the South Tower.

15. The discrepancy was investigated but no determination was made as to the cause of the discrepancy.

16. In September 2020, the general contractor notified the design team that additional beams in the South Tower appeared to have moved as construction had progressed and that cracks had formed in some of the beams.

17. Surveys of the elevations of elements of the South Tower taken in September 2020 indicated that two of the core columns, which were installed over drilled piers, had moved downward over an inch, which was in excess of any expected movement of those structural elements.

18. Additional investigation revealed that nine (9) of the drilled piers for the South Tower experienced unexpected downward movement in excess of any anticipated tolerance.

19. As construction progressed, it was determined that the movement of five (5) of the nine (9) at issue drilled piers had arrested, but that four (4) of the drilled piers continued to move downward.

20. The five (5) drilled piers that had arrested moved between one (1) and two (2) inches.

21. Four (4) of the drilled piers moved in excess of two (2) inches, including one that moved in excess of three-and-a-half (3.5) inches and another in excess of five (5) inches.

22. The movement of the drilled piers pulled down on the slabs, beams and columns of the South Tower and, among other things, adversely impacted the load capacity of those elements of the South Tower and resulted in cracking of those elements.

23. The downward movement of the drilled piers and columns of the South Tower also caused floors, which had been level, to become unlevel.

24. The geotechnical engineer for the Project determined two possible causes of the downward movement: (1) the drilled piers were installed on bedrock with lenses of compressible partially weathered rock ("PWR"), which is essentially densely compacted sand or (2) the drilled piers were installed on compressible joints, fractures or seams.

25. The data and analysis suggested that the most likely cause of the movement was due to the presence of PWR below the tip elevation of the drilled piers. The movement of the PWR due to inadequate compaction allowed the drilled piers to move downward.

26. In order to arrest the movement of the four (4) drilled piers that continued to move and to prevent further loss or damage to the structural elements of the South Tower, it was determined that micropiles needed to be installed at those four locations.

27. The installation of the micropiles and transfer girders arrested the movement of the four (4) drilled piers and transferred the unexpected load forces placed on the columns and beams so that they could function as originally designed.

28. Because columns and beams and other elements cracked and suffered a reduced ability to withstand and accommodate expected dead and live loads as a result of the movement of the drilled piers and because the movement of the drilled piers caused floors to become out of level, NSC was forced to repair, among other things, the damage to those building elements.

29. NSC has incurred in excess of $18 million in expenses related to the design and repair of elements of the South Tower as a result of the movement of the

drilled piers and is expected to incur in excess of $19 million to complete those repairs.

### B. The Hartford Policy.

30. NSC procured a Project Builders Risk policy (Policy No. 61 MA HN3494) with an original Policy Period of February 26, 2019 to August 26, 2021 and a Maximum Limit of Insurance of $432,879,822 from Hartford (the "Hartford Policy"). A true and accurate copy of the Hartford Policy is attached as **Exhibit A**.

31. NSC paid a deposit premium of $512,166.00 for the Hartford Policy.

32. The Insuring Agreement of Coverage A – Direct Damage Coverage of the Hartford Policy states, "We will pay for all risks of direct physical loss or damage that occurs during the "policy term" caused by a Covered Cause of Loss to Covered Property within the Coverage Territory."

33. The Hartford Policy defines "Covered Cause of Loss" as " any cause of loss except those that are excluded under this Policy, unless those excluded Causes of Loss are specifically reinstated by an Optional Policy Extension purchased by you."

34. The Hartford Policy defines "Covered Property" as including "Property that is or will become part of the completed 'insured project' while located at the

'insured project' including…Foundations, excavations and other underground property of a type that is otherwise included as Covered Property."

35. NSC elected to purchase optional coverages available under the Hartford Policy in exchange for the payment of additional premium amounts.

36. NSC purchased, *inter alia*, the following Direct Damage Optional Policy Extensions that were made a part of the Hartford Policy: Expediting Expense and Extra Expense, Professional Design Expenses, Earth Movement and Volcanic Action and Faulty Workmanship/LEG3.

37. The Expediting Expense and Extra Expense coverage has a $10,000,000 Sublimit of Insurance and the Professional Design Expense coverage has a $1,000,000 Sublimit of Insurance.

38. The Earth Movement and Volcanic Action coverage and the Faulty Workmanship/LEG3 coverage each have a Sublimit of Insurance that is "Included in the Policy Maximum Limit of Insurance."

39. The Direct Damage Optional Policy Extensions section of the Hartford Policy contains the following subparts which correspond with the Expediting Expense and Extra Expense coverage purchased by NSC:

> If direct physical loss or damage to Covered Property by a Covered Cause of Loss occurs and is covered under the terms of COVERAGE A – DIRECT DAMAGE COVERAGE, then we will also pay or reimburse the following expenses:

**(1) Expediting Expense**

The reasonable and necessary expenses you incur to:

**(a)** Make temporary repairs and to expedite the permanent repair or replacement of damaged Covered Property, including:

**(i)** Additional wages for overtime, night work, and work on public holidays;

**(ii)** Extra costs of express and air freight; and

**(iii)** Extra costs of rental equipment.

**(b)** Continue the scheduled progress of the "insured project".

**(2) Professional Design Expenses**

The reasonable and necessary expenses you incur for architects, surveyors, consulting engineers or other design professionals to evaluate the repair or replacement of damaged Covered Property.

40. The Harford Policy contains the following section with respect to the Earth Movement and Volcanic Action coverage purchased by NSC:

**(7) Earth Movement and Volcanic Action**

**SECTION C. EXCLUSIONS,** Paragraph **1.a.**, subparagraph **(5) Earth Movement** is deleted, and "earth movement" and "volcanic action" are added as **Covered Causes of Loss**.

However, we will not pay for loss, damage, cost or expense caused directly or indirectly by a "water occurrence", even if attributable to "earth movement" or "volcanic action".

> Any "earth movement", volcanic action, explosion or effusion that began prior to the inception of this Policy shall be deemed to have occurred entirely prior to the "policy term" and is not covered under this Policy.
>
> "Earth movement", volcanic action, explosion or effusion do not apply as Covered Causes of Loss to the Delay and Soft Costs Optional Policy Extension **4.c.(3) Utility Service Interruption**.

41. The Hartford Policy defines "earth movement" as:

> Earth sinking (other than "sinkhole collapse"), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other part of buildings or structures. Soil conditions include contraction, expansion, freezing, thawing, erosion, improper compaction of soil and the action of water under the ground surface.

42. The Hartford Policy contains the following endorsement related to the Faulty Workmanship/LEG III coverage that NSC elected to purchase:

> FAULTY WORKMANSHIP/LEG III
> COMMERCIAL INLAND MARINE COVERAGE PART
>
> THIS POLICY EXCLUDES -
>
> A.  THE COST NECESSARY TO REPLACE, REPAIR OR RECTIFY ANY INSURED PROPERTY WHICH IS DEFECTIVE IN DESIGN PLAN SPECIFICATION MATERIALS OR WORKMANSHIP.
>
> B.  LOSS OR DAMAGE TO THE INSURED PROPERTY CAUSED TO ENABLE REPLACEMENT REPAIR OR RECTIFICATION OF SUCH DEFECTIVE INSURED PROPERTY.

> BUT SHOULD DAMAGE TO THE INSURED PROPERTY "OTHER THAN DAMAGE AS DEFINED IN (B) ABOVE RESULT FROM SUCH A DEFECT THIS EXCLUSION SHALL BE LIMITED TO THE COSTS OF ADDITIONAL WORK RESULTING FROM AND THE ADDITIONAL COSTS OF IMPROVEMENTS TO THE ORIGINAL DESIGN PLAN SPECIFICATION MATERIALS OR WORKMANSHIP.
>
> FOR THE PURPOSE OF THE POLICY AND NOT MERELY THIS EXCLUSION THE INSURED PROPERTY SHALL NOT BE REGARDED AS LOST OR DAMAGED SOLELY BY VIRTUE OF THE EXISTENCE OF ANY DEFECT IN DESIGN PLAN SPECIFICATION MATERIALS OR WORKMANSHIP IN THE INSURED PROPERTY OR ANY PART THEREOF.

**C. Hartford's Investigation and Denial of the Claim.**

43.   NSC provided Hartford timely notice in October 2020 of the issues related to the movement of the drilled piers.

44.   Hartford and its engineering consultant inspected the Project on November 5, 2020.

45.   As part of its investigation, Hartford requested that NSC provide certain documents and information regarding the Project and the loss event, which NSC provided.

46. At no time during its investigation did Hartford indicate that NSC had been unresponsive to its information requests or had not cooperated with Hartford's investigation.

47. When Hartford first began investigating the loss, NSC did not know the reason for the movement of the drilled piers or the extent of the loss or damage, and the initial estimates of repair were below $1 million.

48. As NSC continued to investigate the loss event and learned that four (4) of the drilled piers continued to move, the cost of repairing the Project increased dramatically.

49. NSC kept Hartford apprised of the increases in the estimates to repair the Project.

50. On April 9, 2021, Hartford issued a reservation of rights letter with respect to the loss. A true and accurate copy of the reservation of rights letter is attached as **Exhibit B**.

51. On May 11, 2021, NSC provided Hartford its updated estimate to repair the Project, which was $19,800,620.

52. During a June 21, 2021 phone call, Hartford represented that it was still investigating the loss and that it would be requesting additional information

regarding NSC's contractual rights against third-parties and whether it had waived any rights of subrogation.

53. On July 7, 2021, NSC inquired as to the status of Hartford's additional information requests, as NSC had not received them.

54. On July 14, 2021, Hartford responded that the letter would be coming by the end of the week.

55. The next communication that NSC received from Hartford was a July 15, 2021 letter in which it denied the claim in its totality. A true and accurate copy of the July 15, 2021 letter is attached as **Exhibit C**.

56. In response to the denial, NSC sent a letter dated October 15, 2021 in which it explained the errors in Hartford's denial and demanded payment pursuant to O.C.G.A. § 33-4-6 in the amount it had incurred to repair the damage to date: $18,393,565.93. A true and accurate copy of the October 15, 2021 letter is attached as **Exhibit D**.

57. In a December 15, 2021 letter, Hartford reaffirmed its wrongful denial and rejected NSC's demand for payment. A true and accurate copy of the December 15, 2021 letter is attached as **Exhibit E**.

## Count I – Breach of Contract

58. NSC incorporates Paragraphs 1 through 57 as it stated fully herein.

59. At the time of the loss event, the entire South Tower of the Project, including the drilled piers and the beams, columns and substrates constituted "Covered Property" as defined by the Hartford Policy.

60. The building elements of the South Tower, including the drilled piers and the beams, columns and substrates, suffered loss or damage as a result of the movement of the drilled piers, as they suffered, among other things, cracking and reduced ability to carry expected dead and live loads so that they could not function as intended and actual movement of constructed building elements from the position they were designed and constructed to a different and unacceptable position.

61. The loss or damage to the building elements of the South Tower was the result of a "Covered Cause of Loss" or a cause of loss that qualifies as a "Covered Cause of Loss" pursuant to one or more of the "Direct Damage Optional Policy Extensions" purchased by NSC.

62. NSC has expended $18,996,097.98 to repair the loss or damage resulting from the loss event, and the total cost of repairs may to exceed $19 million.

63. The repairs made to the South Tower of the Project were necessary to repair damage caused by the loss event.

64. NSC complied with all terms and conditions of the Hartford Policy.

65. Hartford is obligated to pay the costs incurred by NSC to repair the loss or damage to the South Tower of the Project pursuant to the terms and conditions of the Hartford Policy.

66. Hartford breached the Hartford Policy by refusing to pay the costs incurred by NSC to repair the loss or damage to the South Tower of the Project.

## Count II – Bad Faith

67. NSC incorporates by reference Paragraphs Nos. 1 through 57 stated above as if fully stated herein.

68. The Project suffered loss or damage as a result of the movement of the drilled piers.

69. The loss or damage to the Project was caused by a "Covered Cause of Loss or a cause of loss that qualifies as a "Covered Cause of Loss" pursuant to one or more of the "Direct Damage Optional Policy Extensions" purchased by NSC.

70. The loss or damage to the Project is covered under the terms and conditions of the Hartford Policy.

71. NSC has complied with the terms and conditions of the Hartford Policy.

72. NSC made a written demand on Hartford to pay the amounts that were due and owed under the Hartford Policy for the loss or damage to the Project.

73. NSC's written demand for payment complied with the requirements of O.C.G.A. § 33-4-6.

74. After receipt of the written demand for payment, Hartford rejected the demand.

75. Hartford refused to pay any of the amounts owed under the Hartford Policy within sixty (60) days of NSC's written demand.

76. Hartford's denial of NSC's claim under the Hartford Policy for loss or damage to the Project and refusal to pay the amounts owed under the Hartford Policy are without reasonable basis or justification.

77. Hartford's denial of NSC's claim under the Hartford Policy for loss or damage to the Project and refusal to pay the amounts owed under the Hartford Policy are vexatious and in bad faith.

78. As a result of Hartford's bad faith refusal to pay for the covered loss or damage to the Project, pursuant to O.C.G.A. § 33-4-6, NSC is entitled to an award of the statutory penalty of up to one-half of the amount owed under the Hartford Policy for covered loss or damage to the Project and an award of NSC's attorney's fees incurred in prosecuting this action.

WHEREFORE, Plaintiff Norfolk Southern Corporation prays for the following:

a) An award of all amounts incurred by NSC to repair the loss or damage caused to the Project in an amount of not less than $18,996,097.98, including prejudgment interest;

b) An award of the statutory penalty of fifty percent (50%) of the amount owed under the Hartford Policy pursuant to O.C.G.A. § 33-4-6;

c) An award of attorney's fees pursuant to O.C.G.A. § 33-4-6;

d) A trial by jury;

e) An award of such other relief as the Court deems just and proper.

This 18th day of February, 2022.

**HALL BOOTH SMITH, P.C.**

*s/ Thomas Wingfield*
Thomas K. Wingfield
Georgia Bar No. 770653
Nneka A. Egwuatu
Georgia Bar No. 864198

191 Peachtree Street
Suite 2900
Atlanta, Georgia 30303-1775
(404) 954-5000 Telephone
(404) 954-5020 Facsimile
twingfield@hallboothsmith.com
negwuatu@hallboothsmith.com

*Counsel for Norfolk Southern Corporation*